NO. _____

---

IN THE
**UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT**

_____♦_____

**IN RE NII HOLDINGS, INC. SECURITIES LITIGATION**

_____♦_____

**ON PETITION FOR PERMISSION TO APPEAL
FROM AN ORDER GRANTING CLASS CERTIFICATION
BY THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NO. 1:14-CV-227 (LMB/JFA) (HON. LEONIE M. BRINKEMA)**

_____♦_____

**DEFENDANTS' PETITION FOR PERMISSION TO APPEAL
PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 23(f)**

_____♦_____

Dorothy J. Spenner
James O. Heyworth
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York  10019
(212) 839-5300

Michael D. Warden
Rebecca K. Wood
Nicholas J. Giles
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, DC  20005
(202) 736-8000 (telephone)
(202) 736-8711 (facsimile)
rwood@sidley.com

*Counsel for Defendants Steven P. Dussek,
Steven M. Shindler, and Gokul V. Hemmady*

---

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................i

TABLE OF AUTHORITIES .........................................................ii

INTRODUCTION ......................................................................1

FACTUAL BACKGROUND.......................................................1

QUESTIONS PRESENTED .......................................................4

RELIEF SOUGHT.......................................................................5

REASONS FOR GRANTING THE PETITION...........................5

I.      THIS COURT SHOULD GRANT REVIEW TO CLARIFY THE
        LAW IN THIS CIRCUIT FOR DEMONSTRATING MARKET
        EFFICIENCY AS A PREREQUISITE TO SECURITIES CLASS
        ACTIONS AND TO CORRECT THE ERROR BELOW..................7

        A.      District Courts In This Circuit Lack Critical Guidance On The
                Relative Importance Of The *Cammer* Factors. ........................ 10

        B.      This Court Should Grant Review To Align Itself With The
                Second Circuit, The Majority Of Federal Courts, And Leading
                Commentators, All Of Which Have Adopted The *Cammer* Fifth
                Factor Of Cause And Effect As The Most Important. ............. 12

II.     THE COURT SHOULD GRANT REVIEW TO CLARIFY
        CLASSWIDE DAMAGES STANDARDS AFTER *COMCAST* AND
        TO CORRECT THE ERROR BELOW........................................... 16

CONCLUSION........................................................................... 20

CERTIFICATE OF SERVICE .................................................... 22

ADDENDUM

*Class Certification Opinion* – ECF No. 227......................................Exhibit 1

*Class Certification Order* – ECF No. 228 .........................................Exhibit 2

*Certification Hearing Transcript* – ECF No. 226 ..............................Exhibit 3

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
    133 S. Ct. 1184 (2013)............................................................................ 13

*Basic, Inc. v. Levinson*,
    485 U.S. 224 (1988)............................................................................ 2, 7

*In re BearingPoint, Inc. Sec. Litig.*,
    232 F.R.D. 534 (E.D. Va. 2006)............................................................ 10

*Bussey v. Macon Cty. Greyhound Park, Inc.*,
    562 F. App'x 782 (11th Cir. 2014)................................................... 17, 20

*Cammer v. Bloom*,
    711 F. Supp. 1264 (D.N.J. 1989).................................................... 3, 8, 12

*Comcast Corp. v. Behrend*,
    133 S. Ct. 1426 (2013)................................................................. *passim*

*In re Comput. Sci. Corp. Sec. Litig.*,
    288 F.R.D. 112 (E.D. Va. 2012)............................................................ 11

*In re DVI, Inc. Sec. Litig.*,
    639 F.3d 623 (3d Cir. 2011), *abrogated on other grounds by*
    *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 133 S. Ct.
    1184 (2013)...................................................................................... 13

*EQT Prod. Co. v. Adair*,
    764 F.3d 347 (4th Cir. 2014) ............................................................ 6, 17

*Ft. Worth Emps.' Ret. Fund. v. J. P. Morgan Chase & Co.*,
    301 F.R.D. 116 (S.D.N.Y. 2014)........................................................... 18

*Gariety v. Grant Thornton, LLP*,
    368 F.3d 356 (4th Cir. 2004) .................................................. 3, 7, 8, 10

*George v. China Auto. Sys., Inc.*,
    No. 11-7533, 2013 WL 3357170 (S.D.N.Y. July 3, 2013) .................... 15

*Halliburton Co. v. Erica P. John Fund, Inc.*,
   134 S. Ct. 2398 (2014) ............................................................... 7

*In re HealthSouth Corp. Sec. Litig.*,
   261 F.R.D. 616 (N.D. Ala. 2009) ............................................. 14

*Lienhart v. Dryvit Sys., Inc.*,
   255 F.3d 138 (4th Cir. 2001) ...................................... 6, 7, 15, 16

*Loritz v. Exide Techs.*,
   No. 13-2607, 2015 WL 6790247 (C.D. Cal. July 21, 2015) .................. 14

*Ludlow v. BP P.L.C.*,
   800 F.3d 674 (5th Cir. 2015) ............................................. 5, 20

*In re NeuStar, Inc. Sec. Litig.*,
   No. 14-885, 2015 WL 5674798 (E.D. Va. Sept. 23, 2015) ..................... 11

*Nucor Corp. v. Brown*,
   760 F.3d 341 (4th Cir. 2014) ................................................ 17

*Parko v. Shell Oil Co.*,
   739 F.3d 1083 (7th Cir. 2014) ......................................... 17, 20

*In re Rail Freight Surcharge Antitrust Litig.*,
   725 F.3d 244 (D.C. Cir. 2013) ......................................... 17, 20

*Scott v. Family Dollar Stores, Inc.*,
   733 F.3d 105 (4th Cir. 2013) ................................................ 17

*Simpson v. Specialty Retail Concepts*,
   823 F. Supp. 353 (M.D.N.C. 1993) .................................... 11, 14

*Sykes v. Mel S. Harris & Assocs. LLC*,
   780 F.3d 70 (2d Cir. 2015) .................................................. 18

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*,
   546 F.3d 196 (2d Cir. 2008) ........................................... 13, 14

*Unger v. Amedisys Inc.*,
   401 F.3d 316 (5th Cir. 2005) ................................................ 14

*In re Xcelera.com Sec. Litig.*,
    430 F.3d 503 (1st Cir. 2005) ...................................................................... 14

**Rules**

Fed. R. App. P. 5 ............................................................................................... 5

Fed. R. Civ. P. 23 ..................................................................................... 4, 5, 6

**Other Authorities**

72 Fed. Reg. 73,534 (Dec. 27, 2007) ............................................................. 9

Michael Hartzmark *et al.*, *Fraud on the Market: Analysis of the
    Efficiency of the Corporate Bond Market*, 2011 COLUM.
    BUS. L. REV. 654, 663 (2011) ................................................................. 13

## INTRODUCTION

The District Court certified a class in a securities action notwithstanding an acknowledged lack of guidance from this Circuit about the proper standard for evaluating key questions involving market efficiency and damages. The decision below thus applied a rule of its own making, a rule that conflicts with well-reasoned decisions of other Circuits. This Court's immediate review is essential both to correct this error and to provide much-needed clarity about the proper standards governing the certification of securities class actions in this Circuit.

## FACTUAL BACKGROUND

Defendants are current and former officers of NII Holdings, Inc., a Reston Virginia-based telecommunications company that provided cellular telephone services in Central and South America through subsidiaries operating under the Nextel brand. *See* Mem. Op. at 2, No. 14-cv-227 (E.D. Va. Nov. 17, 2015) (ECF No. 227) ("Order") (Exhibit 1, hereto).[1] In 2009, NII began transitioning from second generation (2G) wireless networks to third generation (3G) networks to accommodate the markets' increasing preference for high speed data and smart phones. *See* Second Am. Class Action Compl. ¶¶ 1-6, No. 14-cv-227 (E.D. Va. July 18, 2014) (ECF No. 133) ("SAC").

---

[1] NII is no longer a party to this action, as the claims against it were extinguished pursuant to a Chapter 11 bankruptcy proceeding. *See* Order, No. 14-cv-227 (E.D. Va. July 8, 2015) (ECF No. 170).

Plaintiffs are open market purchasers of NII common stock and three series of bonds during the four-year class period. They allege that Defendants misrepresented the progress and success of the 3G transition, and assert liability for securities fraud under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934, and SEC Rule 10b-5. Order at 2. Plaintiffs brought suit on behalf of themselves and a putative class of "at least" thousands of common stock and bond investors who purchased or acquired NII securities during the class period. SAC ¶¶ 346-47.

On November 17, 2015, after briefing and argument, the District Court certified a Rule 23(b)(3) class. In opposing certification, Defendants argued that two key shortcomings precluded Plaintiffs from satisfying Rule 23(b)(3)'s requirement that common questions "predominate over any questions affecting only individual members." *See* Defs' Mem. of Law in Opp. to Lead Plfs' Mot. for Class Cert., No. 14-cv-227 (E.D. Va. Oct. 2, 2015) (ECF No. 210) ("Opp.").

First, Defendants submitted that Plaintiffs failed to meet their burden of showing that the securities at issue traded in an "efficient market," a prerequisite to certification under the Supreme Court's framework for securities class actions in *Basic, Inc. v. Levinson*, 485 U.S. 224 (1988), and its progeny. *See* Opp. at 8-22. Defendants explained that Plaintiffs failed to demonstrate the most important indicator of an efficient market: a cause-and-effect relationship between an unexpected corporate event or financial release and an immediate response in the

2

security price.  *See id.* at 8-11.  This causal relationship is the fifth of five factors set forth in *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989), one of the first cases after *Basic* assessing market efficiency.

In their opposition, Defendants invoked *Cammer* and this Court's decision in *Gariety v. Grant Thornton, LLP*, 368 F.3d 356 (4th Cir. 2004), which cited *Cammer* with approval, as have other Circuits and district courts.  As *Cammer* explained, "one of the most convincing ways" for a plaintiff to prove market efficiency is to demonstrate cause-and-effect movement between corporate events and price:  "This, after all, is the essence of an efficient market and the foundation for the fraud on the market theory."  711 F. Supp. at 1287, 1291.  In addition to this fifth factor, *Cammer* listed four other factors to consider in determining whether a market is efficient.  Many of these other four factors are not disputed in securities cases, as they were not by Defendants below.

The District Court rejected Defendants' argument that the cause-and-effect relationship is the most important indication of market efficiency, concluding that "no one factor is more important than another" under *Gariety*.  Order at 11, 18.  The court cited no law in support of this proposition.  Instead, the District Court cited only a Second Circuit case that it acknowledged was directly contrary, and then explicitly parted ways from that decision.  *See id.* at 11 ("*Contra* [Opp.] at 10 (citing *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546

3

F.3d 196, 207 (2d Cir. 2008))), which followed *Cammer* and held that its cause-and effect fifth factor is "the most important."

Second, Defendants argued that Plaintiffs failed to make the required showing under *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013), that damages were measurable on a classwide basis. *See* Order at 22-29. The District Court rejected this argument, acknowledging that "the Fourth Circuit has not articulated any requirement of a fulsome classwide damages model at the certification stage." *Id.* at 20; *see also id.* at 9 (suggesting that, at the certification stage, "courts must concentrate on the issue of liability rather than damages"). In so doing, the District Court disregarded an apposite Fifth Circuit decision rejecting—in light of *Comcast*—the same methodology employed by the same expert that Plaintiffs offered here. *See id.* at 3. This petition for review follows.

## QUESTIONS PRESENTED

1.      Whether this Court should accept review under Federal Rule of Civil Procedure 23(f) of the District Court's order certifying a securities class action to clarify the Fourth Circuit standard for determining market efficiency and to correct the decision below, which conflicts with the leading cases that consider a cause-and-effect relationship between an unexpected corporate event and an immediate stock price change to be the most important factor in assessing whether there is the requisite market efficiency to justify certifying a securities class action.

4

2.    Whether this Court should accept Rule 23(f) review to clarify the scope of a plaintiff's obligation, at the class certification stage, to demonstrate that damages can be measured on a classwide basis under *Comcast v. Behrend*, 133 S. Ct. 1426 (2013), and to adopt the Fifth Circuit's correct analysis in *Ludlow v. BP P.L.C.*, 800 F.3d 674 (5th Cir. 2015), which rejected the same approach by the same expert that the District Court accepted here.

## RELIEF SOUGHT

Defendants respectfully request that this Court grant Defendants permission to appeal the order of the District Court certifying a securities class action, order full briefing on the merits, and schedule this case for oral argument.  *See* Fed. R. Civ. P. 23(f); Fed. R. App. P. 5.  Defendants respectfully request expedited consideration of this petition, and that the Court expedite merits briefing and argument in light of the schedule in this case, in which dispositive and *Daubert* motions currently are set to be heard on March 31, 2016, and the final pretrial conference is scheduled for April 7, 2016.

## REASONS FOR GRANTING THE PETITION

This Court has discretion to accept immediate review of a district court order "granting . . . class-action certification."  Fed. R. Civ. P. 23(f); *see also* Fed. R. App. P. 5 (addressing permissive appeals).  In evaluating a Rule 23(f) petition, this Court employs "a five-factor 'sliding scale' test" which considers

5

> (1) whether the certification ruling is likely dispositive of the litigation; (2) whether the district court's certification decision contains a substantial weakness; (3) whether the appeal will permit the resolution of an unsettled legal question of general importance; (4) the nature and status of the litigation before the district court (such as the presence of outstanding dispositive motions and the status of discovery); and (5) the likelihood that future events will make appellate review more or less appropriate.

*Lienhart v. Dryvit Sys., Inc.*, 255 F.3d 138, 141, 144 (4th Cir. 2001). This Court reviews these factors "holistic[ally]," and generally will "grant the petition, notwithstanding the other factors, '[w]here a district court's certification decision is manifestly erroneous and virtually certain to be reversed on appeal.'" *EQT Prod. Co. v. Adair*, 764 F.3d 347, 357 (4th Cir. 2014) (quoting *Lienhart*, 255 F.3d at 145). Moreover, review "may be especially appropriate" where certification "turns on a novel or unsettled question of law.'" *Lienhart*, 255 F.3d at 142-43 (quoting Fed. R. Civ. P. 23(f) Advisory Committee Note).

As shown below, the third and second *Lienhart* factors weigh strongly in favor of accepting review here. This case presents an opportunity to clarify two critical and unsettled questions within this Circuit regarding the proper standards for class certification in securities cases. Review also will enable this Court to correct the error of the court below caused by its departure from well-reasoned decisions of sister Circuits. Moreover, given the inevitable pressure that class certification places on defendants to settle, the fifth *Lienhart* factor also supports review: if class certification issues are not resolved now, there may never be an

6

opportunity to resolve them in any appeal from final judgment.  *See id.* at 143-44.

Thus, this Court should take the opportunity now to provide district courts in this

Circuit with clarity in this important area of federal law.

## I.    THIS COURT SHOULD GRANT REVIEW TO CLARIFY THE LAW IN THIS CIRCUIT FOR DEMONSTRATING MARKET EFFICIENCY AS A PREREQUISITE TO SECURITIES CLASS ACTIONS AND TO CORRECT THE ERROR BELOW.

In this case, a putative class of investors seeks to prove that Defendants

violated the securities laws.  To do so requires proof "that, in connection with the

. . . sale of a security, (1) the defendant made a false statement or omission of

material fact (2) with scienter (3) upon which the plaintiff justifiably relied (4) that

proximately caused the plaintiff's damages."  *Gariety*, 368 F.3d at 362 (quotations

omitted).

As the Supreme Court has explained "[r]equiring proof of individualized

reliance from every securities fraud plaintiff effectively would . . . prevent []

[plaintiffs] from proceeding with a class action in Rule 10b-5 suits."  *Halliburton*

*Co. v. Erica P. John Fund, Inc*., 134 S. Ct. 2398, 2407-08 (2014).  For this reason,

the Supreme Court has endorsed a "fraud-on-the-market" path to potential class

certification in this setting.  *See id.* at 2408; *Basic*, 485 U.S. at 242.  Under *Basic*,

"[r]eliance can . . . be treated as a common issue if it is *presumed* under the theory

that the defendants defrauded the market—not the individual plaintiffs—so long as

the plaintiffs purchased their stocked in an efficient market."  *Gariety*, 368 F.3d at

363.   As this Court has observed, *Basic* "offers little guidance for determining whether a market is efficient"; accordingly,

> to determine whether a security trades on an efficient market, a court should consider factors such as, among others, whether the security is actively traded, the volume of trades, and the extent to which it is followed by market professionals.  *See*, *e.g.*, *Cammer v. Bloom,* 711 F. Supp. 1264, 1285-87 (D.N.J. 1989) (examining (1) average trading volume, (2) number of securities analysts following the stock, (3) number of market makers, (4) whether the company was entitled to file an S-3 Registration Statement, if relevant, and (5) evidence of a cause and effect relationship between unexpected news and stock-price changes).  [*Gariety*, 368 F.3d at 368.]

*Gariety* did not have occasion to provide further explanation of how precisely to assess or weigh those factors, although *Cammer* explained the importance of the fifth one:  "[O]ne of the most convincing ways to demonstrate [market] efficiency would be to illustrate, over time, a cause and effect relationship between company disclosures and resulting movements in stock price."  *Cammer*, 711 F. Supp. at 1291.  After all, "empirical facts showing a cause and effect relationship between unexpected corporate events . . . and an immediate response in stock price" is "the essence of an efficient market and the foundation for the fraud on the market theory."  *Id.* at 1287.

In the intervening years since *Cammer* and *Gariety*, the first four *Cammer* factors have become omnipresent for NYSE or NASDAQ listed companies faced with securities fraud lawsuits.  For instance, factors such as average weekly trading volume in this era of high frequency trading, and eligibility to file with the SEC a

8

Registration Statement on Form S-3 in light of the SEC's relaxation of the eligibility requirements in 2007,[2] increasingly are not determinative of market efficiency. Many defendants do not dispute that these factors are met, but contend that they do not answer the question whether a market is efficient and the *Basic* presumption should apply. Thus, inadequate consideration of the fifth factor would, in today's markets, threatens the anomalous result that virtually any class action with respect to a NYSE or NASDAQ listed company could be *per se* certified.

The primacy of *Cammer*'s fifth factor has been acknowledged nearly universally nationwide, including by the Second Circuit. Here too, the fifth *Cammer* factor was key to Defendants' point that Plaintiffs failed to demonstrate market efficiency so as to permit class certification. *See* Opp. at 8-22. Yet the District Court gave it short shrift, invoking *Gariety* and concluding without explanation that "[i]n the Fourth Circuit, no one factor is more important than another." Order at 11. The court below is not alone in this confusion. In the eleven years since *Gariety*, district courts in this Circuit have offered widely divergent views of *Gariety*. *See* § I.A, *infra.* This Court should take this opportunity to correct the

---

[2] *See* SEC Final Rule, 72 Fed. Reg. 73,534 (Dec. 27, 2007) (expanding Form S-3 eligibility to certain companies "without regard to the size of their public float or the rating of debt they are offering").

error below, to provide needed guidance to the district courts in this Circuit, and to bring the law of the Circuit in line with that of its sister Circuits.[3]

### A. District Courts In This Circuit Lack Critical Guidance On The Relative Importance Of The *Cammer* Factors.

In *Gariety*, this Court held that that the district court failed to apply "the rigorous analysis required when determining whether a case may proceed as a class action" and remanded for the district court to analyze those issues in the first instance. *Id.* at 367. As a result, this Court had no occasion to apply the *Cammer* factors it noted for determining the efficiency of a market. *See id.* at 368. Thus, *Gariety* set forth factors to consider, but little explicit guidance about how to do so.

Although Defendants submit the proper analysis is straightforward (as the law of other Circuit courts makes clear), this framework has spawned confusion and divergent approaches in the district courts. For instance, in addition to invoking *Cammer*, *Gariety* listed three specific factors to consider: "whether the security is actively traded, the volume of trades, and the extent to which it is followed by market professionals." *Id.* at 368. Although *Gariety* made clear that courts "should consider [these] factors . . . among others" including the *Cammer* factors, *id.*, some district courts in this Circuit treat it as a closed list. *See, e.g.*, *In*

---

[3] In addition to clarifying the relative importance of the *Cammer* factors to the market efficiency inquiry, this Court also can use this opportunity to clarify whether the inquiry is identical for stocks and bonds. Order at 12 ("[T]he Fourth Circuit has not offered a standard for determining market efficiency for bonds.").

*re BearingPoint, Inc. Sec. Litig.*, 232 F.R.D. 534, 540 (E.D. Va. 2006) ("To prove that the market . . . was efficient, [plaintiff] must demonstrate (i) that the security was actively traded in sufficiently large volumes and (ii) that the share price is followed by market professionals."). Others courts remain open to considering other factors but give no special weight to the fifth *Cammer* factor. *See*, *e.g.*, *In re NeuStar, Inc. Sec. Litig.*, No. 14-885, 2015 WL 5674798, at *7 (E.D. Va. Sept. 23, 2015) ("To assess market efficiency, courts consider whether the security is actively traded, the volume of trades, and the extent to which it is followed by market professionals, among other factors.") (quotation omitted).

District courts in this Circuit also have taken differing approaches to *Gariety*'s invocation of *Cammer*. Before *Gariety*, at least one district court in this Circuit understood that "[t]he fifth *Cammer* factor is perhaps the most important one." *Simpson v. Specialty Retail Concepts*, 823 F. Supp. 353, 355 (M.D.N.C. 1993). Like the District Court here, however, other courts have taken a cramped view of *Cammer* after *Gariety*. For example, one court refused to apply any aspect of *Cammer* beyond what *Gariety* expressly quoted, contending that just "[b]ecause *Cammer* is cited in *Gariety*," it did not follow that "the Fourth Circuit is thereby holding that a cause and effect relationship between unexpected news and changes in the price of . . . stock is the most important element in demonstrating efficiency." *In re Comput. Sci. Corp. Sec. Litig.*, 288 F.R.D. 112, 120 (E.D. Va.

2012). The court below took a similar stance. *See* Order at 11 ("[I]n the Fourth Circuit, no one factor is more important than another . . . .").

This Court should settle this confusion and clarify the proper standard for establishing an efficient market for securities class certification purposes.

### B. This Court Should Grant Review To Align Itself With The Second Circuit, The Majority Of Federal Courts, And Leading Commentators, All Of Which Have Adopted The *Cammer* Fifth Factor Of Cause And Effect As The Most Important.

The District Court's departure from the reasoning in *Cammer* not only ignores the central analysis of that case, but also parts ways with well-reasoned decisions from sister Circuits and other courts with considerable experience addressing securities class action issues. The effect on price of unexpected news or corporate events is the quintessential indicator of an efficient market. *Cammer*, 711 F. Supp. at 1287 (characterizing this factor as "the *essence* of an efficient market and the *foundation* for the fraud on the market theory") (emphasis added). By placing this factor on equal footing with other considerations—such as whether a company filed Registration Statements on Form 2-3, or was followed by securities analysts—is illogical and effects a drastic expansion of the concept of an efficient market and, in turn, the fraud-on-the-market presumption of reliance. If the other factors were always enough, it is hard to discern any meaningful way to ensure that virtually any NYSE or NASDAQ listed company was actually being traded in a sufficiently efficient market to permit class certification.

12

By clarifying its position on the fifth *Cammer* factor, this Court can and should correct the decision of the court below and align itself with the great weight of authority nationwide. *Cammer* has enjoyed broad influence since it was decided. Indeed, "[t]o certify an investor class in Section 10 and Rule 10b-5 securities litigation the federal courts have relied for almost twenty years on the *Cammer* court's list of factors as a framework for determining whether securities traded in open, developed, and efficient markets," adding "various modifications" along the way. Michael Hartzmark *et al.*, *Fraud on the Market: Analysis of the Efficiency of the Corporate Bond Market*, 2011 COLUM. BUS. L. REV. 654, 663 (2011); *see also Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 204 n.11 (2d Cir. 2008) (noting that *Cammer* is "routinely . . . applied by district courts" across all circuits); *In re DVI, Inc. Sec. Litig.*, 639 F.3d 623, 634 (3d Cir. 2011) (noting that "[m]any of our sister circuits have also approved of [the] use" of the *Cammer* factors), *abrogated on other grounds by Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 133 S. Ct. 1184 (2013).

Indeed, every Circuit to reach the issue, and a majority of other courts, agree that demonstrating a cause-and-effect relationship between unexpected corporate events and a change in the price of a security is the most important factor in evaluating whether a market is "efficient" within the meaning of class certification law. For example, as the Second Circuit held in the decision that the court below

13

expressly declined to follow: "Evidence that unexpected corporate events or financial releases cause an immediate response in the price of a security has been considered the most important[] *Cammer* factor, and the essence of an efficient market and the foundation for the fraud on the market theory." *Teamsters*, 546 F.3d at 207. The Fifth Circuit has followed suit, observing that "the causal connection [i]s one of the most important market-efficiency factors. It goes to the heart of the 'fraud on the market' theory: In an efficient market, where information is nearly perfect, material misstatements alter a stock's price almost immediately." *Unger v. Amedisys Inc.*, 401 F.3d 316, 324 (5th Cir. 2005). So, too, has the First Circuit. *In re Xcelera.com Sec. Litig.*, 430 F.3d 503, 512 (1st Cir. 2005) (recognizing "the fifth, and in many ways, the most important, *Cammer* factor"). These circuits are joined by many district courts nationwide including, as noted, at least one in this Circuit. *See*, *e.g.*, *Loritz v. Exide Techs.*, No. 13-2607, 2015 WL 6790247, at *9 (C.D. Cal. July 21, 2015) ("The fifth *Cammer* factor— causation—is the most important."); *In re HealthSouth Corp. Sec. Litig.*, 261 F.R.D. 616, 635 (N.D. Ala. 2009) (price reaction is "'most important' *Cammer* factor"); *Simpson*, 823 F. Supp. at 355. Accepting review now will enable this Court to make clear that it has not adopted a contrary position. *Contra* Order at 11 (stating "in the Fourth Circuit, no one factor is more important than another").

14

Other courts' nearly universal focus on cause-and-effect in determining market efficiency is no accident, and the District Court's error in analyzing cause-and-effect was acute.   The very essence of market efficiency is proven by statistically significant (and directionally consistent) stock price movement in response to most, if not all, new, value-relevant news—*i.e.*, price going up with good news and down with bad news.  *See* Opp. at 15-22.  Thus, for example, numerous courts have concluded that plaintiffs do not meet their burden to prove market efficiency where prices failed to react to news more than half the time.  *See id.* at 19-20 (citing cases); *e.g.*, *George v. China Auto. Sys., Inc.*, No. 11-7533, 2013 WL 3357170 (S.D.N.Y. July 3, 2013) (denying certification where there was statistically significant price movement on less than 50% of the news days studied, rejecting study that compared reaction on news days to reaction on no-news days, and holding that defendants did not need demonstrate inefficiency).  Yet here, even Plaintiffs' own event study concluded that price for NII bonds failed to react 50-60% of the time.  *See* Opp. at 2, 12-13, 17-20.  This Court's review is needed to correct this and other errors in evaluating market efficiency.

Accepting review at this juncture is all the more critical given the inevitable financial pressure class certification places on defendants to settle prematurely even the most non-meritorious litigation before an appeal can be taken at final judgment.  *See*, *e.g.*, *Lienhart*, 255 F.3d at 143 ("'some plaintiffs . . . may be

15

tempted to use the class device to wring settlements from defendants'"). As this Court recognized in *Lienhart*, this reality has led courts to consider "the likelihood that future events will make appellate review more or less appropriate" when deciding whether to accept review at the class certification stage. *Id.* at 144.

This Court should seize this chance to provide needed guidance to the district courts of this Circuit, to correct the error below, and to follow numerous well-reasoned decisions explaining the particular importance of *Cammer*'s fifth factor in establishing the efficient market needed to certify a securities class action.

## II. THE COURT SHOULD GRANT REVIEW TO CLARIFY CLASSWIDE DAMAGES STANDARDS AFTER *COMCAST* AND TO CORRECT THE ERROR BELOW.

In recent years, the United States Supreme Court has issued a number of decisions addressing the requirements plaintiffs must meet to show that common issues predominate in a putative class action. In the watershed decision of *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013), the Supreme Court held that the damages model advanced by the plaintiffs "failed to measure damages resulting from the particular . . . injury on which . . . liability in this action is premised." *Id.* at 1433. The Court instructed lower courts faced with a putative Rule 23(b)(3) class to "conduct a rigorous analysis to determine" whether "a model purporting to serve as evidence of damages . . . measure[s] *only* those damages attributable to" the specific theory of liability at issue. *Id.* (emphasis added). A model that fails to

16

meet this threshold "cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)." *Id.*

Courts have taken divergent views about the scope of *Comcast*. As the District Court recognized, "the Fourth Circuit has not articulated any requirement of a fulsome classwide damages model at the certification stage." Order at 20. Indeed, this Court has not yet had occasion to consider the parameters of a plaintiff's burden to prove a viable measure of classwide damages.[4] Guidance is needed about the standards governing plaintiffs' obligation to provide a viable damages mechanism sufficiently linked to their theory of liability. This Court should take this opportunity to clarify what is needed after *Comcast*.

Several Circuits have distilled *Comcast* to the following rule: "No damages model, no predominance, no class certification." *In re Rail Freight Surcharge Antitrust Litig.*, 725 F.3d 244, 253 (D.C. Cir. 2013); *see also*, *e.g.*, *Parko v. Shell Oil Co.*, 739 F.3d 1083, 1086 (7th Cir. 2014) (reversing class certification under *Comcast* because "[t]he judge should have investigated the realism of the plaintiffs' injury and damage model in light of the defendants' counterarguments, and to that end should have taken evidence"); *Bussey v. Macon Cty. Greyhound Park, Inc.*, 562 F. App'x 782, 791 n.8 (11th Cir. 2014) (remanding and instructing

---

[4] Three of this Court's opinions have cited *Comcast*, none of which involve this issue. *See EQT Prod.*, 764 F.3d 347; *Nucor Corp. v. Brown*, 760 F.3d 341 (4th Cir. 2014); *Scott v. Family Dollar Stores, Inc.*, 733 F.3d 105, 109 (4th Cir. 2013).

that "plaintiffs must show a model establishing that 'damages are capable of measurement on a classwide basis'") (quoting *Comcast*, 133 S. Ct. at 1433).

Other courts, like the District Court here, have taken a more relaxed view of the Supreme Court's decision, and have not required plaintiffs to come forward with a damages model as a prerequisite to certification. *See*, *e.g.*, Order at 20 ("Despite the defendants' arguments to the contrary, *Comcast* merely held that 'a model purporting to serve as evidence of damages in [a] class action must measure only those damages attributable to that theory.'") (quoting *Comcast*, 133 S. Ct. at 1433); *Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 88 (2d Cir. 2015) (after *Comcast*, "[a]ll that is required at class certification is that the plaintiffs must be able to show that their damages stemmed from the defendant's actions that created the legal liability") (internal quotation omitted).

Here, Defendants contended that Plaintiffs failed to present a viable mechanism for determining damages, as required by *Comcast*. The District Court held that Plaintiffs "provide[d] adequate detail regarding a method for calculating classwide damages and measuring the artificial inflation of each share on a given day." Order at 20. But Plaintiffs did not provide granularity about how their methodology permits the calculation of classwide damages and how it is linked to their theory of liability. *See*, *e.g.*, Opp. at 24-25; *Ft. Worth Emps.' Ret. Fund. v. J. P. Morgan Chase & Co.*, 301 F.R.D. 116, 141 (S.D.N.Y. 2014).

This Court's review is needed not only to clarify the correct approach to damages post-*Comcast*, but also to correct the District Court's error. The District Court erred in suggesting that, at the certification stage, "courts must concentrate on the issue of liability rather than damages," Order at 9, given *Comcast*'s admonition that courts must "rigorous[ly]" review damages issues, 133 S. Ct. at 1433. Whether this Court ultimately requires a damages "model" in every instance or not, it should at least make clear that the cursory examination of the damages issue here fell well short of the "rigorous analysis" *Comcast* unambiguously requires. In less than a page of analysis, the opinion below accepted that Plaintiffs' "method for calculating classwide damages" was "widely accepted" and "traditional," while summarily concluding that "[t]here is no convincing demonstration by the defendants" of its inadequacy. Order at 20-21.

In doing so, the District Court overlooked Defendants' robust showing—supported by an expert report—of why the formula urged by Plaintiffs does not suffice. *See* Order at 25-26. Defendants thoroughly explained that Plaintiffs' method is inapposite here given Plaintiffs' materialization-of-the-risk theory of loss causation. The Fifth Circuit has explained—in *rejecting* the same damages approach by the same expert as Plaintiffs utilized here—that under a materialization-of-the-risk theory, the plaintiffs allege that a defendant "had understated the risk of catastrophe, and when that risk materialized," plaintiffs

19

should be permitted to "recover [the] resulting damages." *BP*, 800 F.3d at 680. *Cf.* SAC ¶ 285 (alleging that "[t]he true state of the Company's obsolescent business model and declining prospects became clear . . . through the materialization of the risks concealed by the Company"). But a "materialization-of-the-risk model cannot be applied uniformly across the class, as *Comcast* requires, because it lumps together those who would have bought the stock at the heightened risk with those who would not have." *BP*, 800 F.3d at 691.

Although Defendants addressed the Fifth Circuit's directly apposite analysis in detail in their brief (*e.g.*, Opp. at 25-29), the Order fails to cite—much less distinguish—that case. Thus, this Court's immediate review is needed. By doing so, this Court not only would correct a critical error and provide necessary guidance, but it would also be joining many sister Circuits that have enforced a rigorous review of damages models following *Comcast*. *See*, *e.g.*, *Parko*, 739 F.3d at 1086; *In re Rail Freight*, 725 F.3d at 255; *Bussey*, 562 F. App'x at 790.

In sum, in contrast to many sister Circuits, this Court has not yet had the chance to fully engage with the *Comcast* decision. This Court should take this opportunity to clarify the meaning of *Comcast* and to correct the error below.

## CONCLUSION

For these reasons, the Court should grant review of the class certification order and enter an expedited schedule for full merits briefing and oral argument.

Dated:  December 1, 2015        Respectfully submitted,

  /s/ Rebecca K. Wood
Michael D. Warden
Rebecca K. Wood
Nicholas J. Giles
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, DC  20005
(202) 736-8000 (telephone)
(202) 736-8711 (facsimile)
rwood@sidley.com

Dorothy J. Spenner
James O. Heyworth
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York  10019
(212) 839-5300

*Counsel for Defendants Steven P. Dussek, Steven M. Shindler, and Gokul V. Hemmady*

## CERTIFICATE OF SERVICE

I certify that Defendants' Petition For Permission To Appeal Pursuant To Federal Rule Of Civil Procedure 23(f) and Addendum were filed electronically on December 1, 2015.  Notice of this filing is being sent by United States first-class mail and electronic mail to Plaintiffs' counsel listed below.

/ s / Rebecca K. Wood

Susan R. Podolsky
Law Offices of Susan R. Podolsky
1800 Diagonal Road, Suite 600
Alexandria, VA 22314
spodolsky@podolskylaw.com

*Liaison Counsel for the Class*

Joel H. Bernstein
Serena P. Hallowell
Eric D. Gottlieb
Labaton Sucharow LLP
140 Broadway
New York, NY 10005
jbernstein@labaton.com
shallowell@labaton.com
egottlieb@labaton.com

*Co-Lead Counsel for the Class*

Gregory Castaldo
Daniel C. Mulveny
Kessler Topaz Meltzer & Check, LLP
280 King of Prussia Road
Radnor,  PA 19087
gcastaldo@ktmc.com

*Co-Lead Counsel for the Class*

Jennifer L. Joost
Kessler Topaz Meltzer & Check, LLP
One Sansome Street, Suite 1850
San Francisco, CA 94104
jjoost@ktmc.com

*Counsel for Plaintiffs*

James M. Hughes
David P. Abel
Motley Rice LLC
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464
jhughes@motleyrice.com
dabel@motleyrice.com

*Counsel for Additional Plaintiff*
*TOBAM, SAS*

Gerald H. Silk
Jai K. Chandrasekhar
Bernstein Litowitz Berger
    & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
jerry@blbglaw.com
jai@blbglaw.com

*Additional Counsel for the Class*

# ADDENDUM

# EXHIBIT 1

(*Class Certification Opinion* – ECF No. 227)

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

|  |  |  |
|---|---|---|
| IN RE NII HOLDINGS, INC. SECURITIES LITIGATION | ) ) ) ) ) ) ) ) ) | 1:14-CV-227(LMB/JFA) |

## MEMORANDUM OPINION

Lead Plaintiffs seek to certify a nationwide class pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3)

composed of "[a]ll persons and entities that, during the period from February 25, 2010 through

February 27, 2014, inclusive, purchased or otherwise acquired the publicly traded securities of NII

Holdings, Inc. ("NII Holdings") and/or NII Capital Corp. ("NII Capital", [sic] together with NII

Holdings, "NII" or the "Company") and who were damaged thereby." Pls.' Mem. in Supp. of Lead

Pls.' Mot. for Class Cert. and Appoint. of Class Reps. and Class Counsel at 1 [Dkt. No. 200], Sept.

11, 2015 ("Pls.' Mem."). Lead Plaintiffs request that this class include all persons and entities that

transacted in NII common stock and three different NII bonds, a 10% Note, an 8.875% Note, and a

7.625% Note. Id. Lead Plaintiffs also seek the appointment of Lead Plaintiffs as Class

representatives. Id. Finally, Lead Plaintiffs seek the appointment of Labaton Sucharow LLP

("Labaton") and Kessler Topaz Meltzer & Check, LLP ("Kessler Topaz") as Co-Class Counsel

and Susan R. Podolsky as Class Liaison Counsel. Id. For the reasons that follow, this motion will

be granted.

## I. BACKGROUND

This action arises out of a strategic business shift undertaken by NII Holdings, Inc., which

is a telecommunications company headquartered in Virginia. NII offered wireless voice and data

services through its Nextel-branded subsidiaries in Brazil, Mexico, Argentina, Chile, and Peru.

Defs.' Mem. in Opp'n to Lead Pls.' Mot. for Class Cert. and Appoint. of Class Reps. and Counsel

at 3 [Dkt. No. 210], Oct. 2, 2015 ("Defs.' Opp'n"). Beginning in 2009, NII started to transition its

cellular networks in the above-mentioned countries from second-generation ("2G") technology to

third-generation ("3G") technology. Pls.' Mem. at 3.

        Lead Plaintiffs, all of which are large pension funds, brought this action against NII and

three current and former NII officers—Steven Dussek, who was Chief Executive Officer until

December 2012; Steven Shindler, who was Chief Executive Officer after December 2012; and

Gokul Hemmady, who was Chief Financial Officer until October 2012 and Chief Operating

Officer after June 2012, continuing in that position until the end of the class period. Id. On

September 15, 2014, NII filed for Chapter 11 bankruptcy protection in the U.S. Bankruptcy Court

for the Southern District of New York and received court approval of its bankruptcy plan in June

2015. Pls.' Mem. at 2 n.3. Due to the bankruptcy, all claims against NII have been extinguished,

leaving only the individual NII officers as defendants in this civil action which charges them in

two counts with violations of § 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 and

with "control person" liability under § 20(a) of the Securities Exchange Act of 1934. Id. These

counts are premised on allegations that defendants "engaged in a pattern of lies and half-truths

concerning the progress and efficacy of NII's 3G transition, the quality of its customer base, and

the company's ability to generate and maintain positive subscriber growth metrics." Pls.' Mem. at

3-4.

## II. DISCUSSION

### A. **STANDARD OF REVIEW**

It is axiomatic that plaintiffs, as the parties seeking class certification, have the burden of proving that all class certification requirements are met. Wal-Mart Stores, Inc. v. Dukes, 131 S.Ct. 2541, 2551 (2011); see also Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 614 (1997). In the Fourth Circuit, plaintiffs must "establish by a preponderance of the evidence that the action complies with each part of Rule 23." Brown v. Nucor Corp., 785 F.3d 895, 931 (4th Cir. 2015). Lead Plaintiffs therefore bear the burden of demonstrating (1) that the class is so numerous that the joinder of all members would be impracticable; (2) that questions of law or fact are common to the class; (3) that their claims or defenses are typical of those of the class; and (4) that they will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a). Apart from these Rule 23(a) requirements, plaintiffs must also demonstrate that the requirements of Rule 23(b)(3) are met—namely, that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy."

Importantly, as the Supreme Court recently reiterated, the Court must perform a "rigorous analysis" to determine whether the party seeking class certification has borne the burden of establishing that it satisfies the certification requirements. Comcast Corp. v. Behrend, 133 S.Ct. 1426, 1432 (2013) (quoting Wal-Mart, 131 S. Ct. at 2551). The Supreme Court has further advised that "sometimes it may be necessary for [lower courts] to probe behind the pleadings before coming to rest on the certification question" because "class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." Id. (quoting Wal-Mart, 131 S. Ct. at 2551 (internal quotation marks omitted)). Such an analysis is appropriate to ensure that class actions remain "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." Califano v.

Yamasaki, 442 U.S. 682, 700-01 (1979).

### B. RULE 23(A)

"In determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met." Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 178 (1974). Defendants do not dispute that Lead Plaintiffs have satisfied the requirements of Fed. R. Civ. P. 23(a); instead, their challenge to certification principally centers on Lead Plaintiffs' showing of market efficiency as it relates to the finding of predominance required by Fed. R. Civ. P. 23(b)(3). Nevertheless, this Court must still undertake a "rigorous analysis" to ensure that plaintiffs have carried their burden of satisfying both Fed. R. Civ. P. 23(a) and (b) by a preponderance of the evidence. See Comcast, 133 S.Ct. at 1432.

1. Numerosity

Lead Plaintiffs must show that the proposed class "is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Although neither the Federal Rules nor the federal courts have identified a particular threshold, classes as small as "twenty-five or more" have been certified. See, e.g., Talbott v. GC Servs., 191 F.R.D. 99, 102 (W.D. Va. 2000); see also Holsey v. Armour & Co., 743 F.2d 199, 217 (4th Cir. 1984) (finding between 46 and 60 members sufficient). As Lead Plaintiffs point out, numerosity is rarely disputed in securities fraud class actions, and this class action is no different. Pls.' Mem. at 5-6. During the class period, between 166 million and 173 million shares of NII stock were outstanding and more than $2 billion in NII Bonds were outstanding as of February 21, 2014. Id. at 6. On average, 42.4% of the bonds were held by non-institutional investors. Id. These statistics give rise to a strong inference that class membership is so numerous that joinder would be impracticable. Accordingly, this element is

4

easily satisfied.

### 2. Commonality

Lead Plaintiffs must next show that "there are questions of law or fact common to the [proposed] class." Fed. R. Civ. P. 23(a)(2). Commonality focuses on the relationship class members have to each other qualitatively, not quantitatively. Although commonality requires only the presence of a single common question, not just any common question will do. Instead, a plaintiff must "demonstrate that the class members have suffered the same injury[,]" Wal-Mart, 131 S. Ct. at 2551 (internal quotation marks and citation omitted), which is a shared injury dependent upon a "common contention." Id. "That common contention, moreover, must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." Id. In other words, a plaintiff must demonstrate that a classwide proceeding has the capacity "to generate common answers apt to drive the resolution of the litigation." Id. To this end, the commonality inquiry tends to merge into the typicality inquiry.

Lead Plaintiffs provide a non-exhaustive list of five questions of fact and law common to all members of the proposed class.

- whether defendants' alleged acts and omissions violated the federal securities laws;
- whether defendants disseminated any public statements during the class period that contained material misrepresentations or omitted material facts;
- whether defendants acted knowingly, or with reckless disregard, in misrepresenting or omitting those material facts;
- whether the market prices of NII Stock and NII Bonds were artificially inflated during the class period as a result of the misrepresentations or omitted material facts; and
- whether Lead Plaintiffs and other members of the class suffered damages, as well as the appropriate measure thereof.

Pls.' Mem. at 7. As was the case in In re NeuStar, Inc. Securities Litigation, No. 1:14-CV-885, 2015 WL 5674798, at *6 (E.D.Va. Sept. 23, 2015), "the questions of whether Defendants'

statements or omissions were material, whether they were made in connection with the purchase or sale of securities, and whether they were made with scienter, are necessarily common to each class member given that Defendants' conduct alone is relevant to their proof." Id. (internal quotation marks omitted). Accordingly, this requirement is also satisfied.

       3.  Typicality

    A plaintiff must also show that its "claims or defenses . . . are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). The typicality requirement is designed to ensure that the class representative's interests are sufficiently aligned with those of the other class members, and it is therefore "satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." Robinson v. Metro-North Commuter R.R. Co., 267 F.3d 147, 155 (2d Cir. 2001); see also Beck v. Maximus, Inc., 457 F.3d 291, 295-96 (3d Cir. 2006); James v. City of Dallas, Tex., 254 F.3d 551, 571 (5th Cir. 2001). "Typicality requires that the claims of the named class representatives be typical of those of the class; 'a class representative must be part of the class and possess the same interest and suffer the same injury as the class members.'" Lienhart v. Dryvit Systems, Inc., 255 F.3d 138, 146 (4th Cir. 2001) (quoting General Tel. Co. of Southwest v. Falcon, 457 U.S. 147, 156 (1982)). Put simply, a Lead Plaintiff must demonstrate that it has claims that are of the same sort as other members of the proposed class.

    Lead Plaintiffs contend that they satisfy the typicality requirement because like other members of the proposed Class, they seek to recover damages for losses caused by the same materially false and misleading statements and omissions allegedly disseminated by defendants. Pls.' Mem. at 8. They aver that collectively Lead Plaintiffs incurred losses of more than $15 million with respect to their NII securities holdings. Id. at 9. As Lead Plaintiffs point out, the

named plaintiffs are typical of the class because they too seek to recover damages for losses caused by the same allegedly materially false and misleading statements and omissions. Id. at 8. As a result, as Lead Plaintiffs correctly argue, "as goes the claim of the named plaintiff, so go the claims of the class." Id. at 9. (quoting Broussard v. Meineke Discount Muffler Shops, Inc., 155 F.3d 331, 340 (4th Cir. 1998) (internal quotation marks omitted)). As such, Lead Plaintiffs have satisfied the typicality requirement.

### 4. Adequacy of Representation

Lastly, a plaintiff must show that it "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "[A] class representative must be part of the class and possess the same interest and suffer the same injury as the class members." Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 156 (1982) (internal quotation marks omitted). The adequacy requirement is designed to detect and avoid potential conflicts between the class representative and other class members. See Amchem, 521 U.S. at 625-26. Potential conflicts between the class representative and class members include "differences in the type of relief sought, especially retrospective versus prospective relief." Id. In other words, the class representative's interest in prosecuting its own case must simultaneously tend to advance the interests of the other class members. Id. at 626 n.20. Notably, this Court has already determined that under the Private Securities Litigation Reform Act ("PLSRA"), 15 U.S.C. § 78u-4, Lead Plaintiffs, Co-Class Counsel, and Class Liaison Counsel were adequate. See Order for Appointment of Lead Plaintiff and Approval of Selection of Counsel [Dkt. No. 101], Jun. 10, 2014.

As Lead Plaintiffs demonstrate, their interests are aligned with the interests of absent class members, thereby suggesting their adequacy as class representatives. Pls.' Mem. at 10. The Lead Plaintiffs are all sizeable pension funds that have a strong incentive to seek the largest possible

recovery on behalf of their beneficiaries. Id. at 10-11. Although defendants half-heartedly dispute Lead Plaintiffs' adequacy in the Statement of Facts portion of their Opposition—describing Lead Plaintiffs as "differently situated with respect to each of the alleged materialized risk events and corrective disclosures," Defs.' Opp'n. at 4—that argument does not rebut the strong evidence demonstrating that Lead Plaintiffs' interests are aligned with those of the putative class in terms of establishing defendants' liability and obtaining the maximum possible recovery. Pls.' Mem. at 10. Lead Plaintiffs have also put forth evidence that these pension funds are committed to working cohesively as a group to prosecute the action, and all of the Lead Plaintiffs have filed certifications attesting that they would competently fulfill their role as Class Representatives. Id. Taken as a whole, Lead Plaintiffs have demonstrated by a preponderance of the evidence that they would satisfy the requirement of adequate representation.

In terms of the adequacy of proposed class counsel, Rule 23(g)(1)(A) dictates that a court must consider "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's work experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(A). Defendants do not dispute that proposed Co-Class Counsel and Class Liaison Counsel are highly experienced in litigating these types of actions and have a proven track record in prosecuting complex securities actions. Pls.' Mem. at 12. Moreover, proposed Co-Class Counsel and Class Liaison Counsel have already undertaken substantial work in identifying, investigating, and initiating this action, which further suggests their adequacy. Id. Accordingly, Lead Plaintiffs, Co-Class Counsel, and Class Liaison Counsel have made the requisite showing that they would adequately represent the interests of absent class members.

## C. **RULE 23(B)(3)**

In addition to satisfying the prerequisites of Rule 23(a), the representative of a proposed

class also bears the burden of satisfying the requirements of one of the three Rule 23(b) categories.

In this case, Lead Plaintiffs have requested "opt-out class" certification under Rule 23(b)(3), which

requires the Court to find (1) that "questions of law or fact common to the members of the class

predominate over any questions affecting only individual members" and (2) that "a class action is

superior to other available methods for the fair and efficient adjudication of the controversy." Fed.

R. Civ. P. 23(b)(3).

### 1. Predominance

Rule 23(b)(3)'s predominance requirement is similar in focus albeit "far more demanding"

than Rule 23(a)'s commonality requirement. Amchem, 521 U.S. at 624. The purpose of the

heightened standard is to test whether the proposed class "is sufficiently cohesive to warrant

adjudication by representation." Id. at 623-24. For this reason, courts must concentrate on the issue

of liability rather than damages, "and if the liability issue is common to the class, common

questions are held to predominate over individual ones," In re BearingPoint, Inc. Sec. Litig., 232

F.R.D. 534, 542 (E.D. Va. 2006); however, if resolution of the liability issue "turns on a

consideration of the individual circumstances of each class member," certification under Rule

23(b)(3) is inappropriate. Thorn v. Jefferson-Pilot Life Ins. Co., 445 F.3d 311, 319 (4th Cir. 2006).

In addition, fraud cases like this one are particularly appropriate candidates for treatment under

Rule 23(b)(3) given that the elements of the cause of action generally relate to the acts or

omissions of the defendants and because individual damages might be too paltry to justify bringing

individual cases. Amchem, 521 U.S. at 591.

A standard element of all fraud claims is that a plaintiff reasonably relied on the alleged

misrepresentation or omission. Requiring an individualized showing of the reliance element in a securities fraud class action would nearly always cause individualized issues to predominate over issues common to the class, thereby defeating any chance for class action. To avoid this result in such fraud cases, the Supreme Court has explicitly allowed a class to be certified based on a reasonable presumption of reliance. See Basic v. Levinson, 485 U.S. 224 (1988) (adopting fraud-on-the-market theory) (hereinafter "Basic presumption"). The Basic presumption is premised upon the fraud-on-the-market theory, which holds that "a public, material misrepresentation will distort the price of stock traded in an efficient market, and that anyone who purchases the stock at the market price may be considered to have done so in reliance on the misrepresentation." Halliburton Co. v. Erica P. John Fund, Inc., 134 S. Ct. 2398, 2417 (2014) ("Halliburton II"). Accordingly, "[t]o prove such indirect reliance [to receive the benefit of the Basic presumption], a plaintiff must show (1) that the alleged misrepresentations were publicly known, (2) that they were material, (3) that the stock traded in an efficient market, and (4) that the plaintiff traded the stock between the time the misrepresentations were made and when the truth was revealed. At the class certification stage, however, no proof of materiality is required." Brown, 785 F.3d at 931 (citing Halliburton II, 134 S. Ct. at 2408 (internal quotation marks omitted)). Similarly, no proof of loss causation is required. Amgen Inc. v. Connecticut Ret. Plans & Trust Funds, 133 S. Ct. 1184, 1192 (2013) (internal citation omitted). Accordingly, at this stage, a plaintiff need only demonstrate by a preponderance of the evidence that the alleged misrepresentations were publicly known and that the stock traded in an efficient market.

Defendants do not dispute that the alleged false statements were clearly in the public arena because the majority of these statements appeared in NII's SEC filings, in conference calls with analysts and investors, and in press releases. Pls.' Mem. at 16 (citing Compl. ¶¶ 53, 54, 56, 60,

65-67, 76, 77, 82, 83, 87-89, 92, 97, 99-101, 104, 105, 111-319). Accordingly, for Lead Plaintiffs

to receive the benefit of the <u>Basic</u> presumption, all that remains for them to show at this stage is

that the securities at issue traded in an efficient market.

In the Fourth Circuit, the standard for determining whether a security trades in an efficient

market is determined by considering: "factors such as, among others, whether the security is

actively traded, the volume of trades, and the extent to which it is followed by market

professionals. <u>See, e.g.</u>, <u>Cammer v. Bloom</u>, 711 F.Supp. 1264, 1285-87 (D.N.J. 1989) (examining

(1) average trading volume, (2) number of securities analysts following the stock, (3) number of

market makers, (4) whether the company was entitled to file an S-3 Registration Statement, if

relevant, and (5) evidence of a cause and effect relationship between unexpected news and

stock-price changes)." <u>Gariety v. Grant Thornton, LLP</u>, 368 F.3d 356, 368 (4th Cir. 2004). The

<u>Cammer</u> factors cited by the <u>Gariety</u> opinion are merely instructive in this inquiry. <u>Carpenters</u>

<u>Pension Trust Fund of St. Louis v. Barclays PLC</u>, No. 12-CV-5329 SAS, 2015 WL 5000849, at *9

(S.D.N.Y. Aug. 20, 2015) (explaining that "the vast majority of courts have used the <u>Cammer</u>

factors as an analytical tool rather than as a checklist" (internal quotation marks omitted)). Despite

defendants' arguments to the contrary, in the Fourth Circuit, no one factor is more important than

another when a court undertakes the holistic and fact-intensive inquiry of determining whether a

market is efficient. <u>Contra</u> Defs.' Opp'n at 10 (citing <u>Teamsters Local 445 Freight Div. Pension</u>

<u>Fund v. Bombardier Inc.</u>, 546 F.3d 196, 207 (2d Cir. 2008)).

Although the showings to establish market efficiency for bond markets differs from the

showing for stock exchanges, courts tend to employ the <u>Cammer</u> factors as an analytical tool when

determining whether bonds traded in an efficient market. <u>See</u> <u>Bombardier Inc.</u>, 546 F.3d at 210; <u>In</u>

<u>re DVI Inc. Sec. Litig.</u>, 249 F.R.D. 196, 214 (E.D. Pa. 2008) <u>aff'd sub nom.</u> <u>In re DVI, Inc. Sec.</u>

Litig., 639 F.3d 623 (3d Cir. 2011) (explaining that "the Court will take the same general approach for determining the market-efficiency of DVI's Senior Notes as with DVI common stock, bearing in mind [the] structural differences [between debt and equity securities markets]"); In re Safety-Kleen Corp. Bondholders Litig., No. 3:00-1145-17, 2004 WL 3115870, at *4 (D.S.C. Nov. 1, 2004). Because the Fourth Circuit has not offered a standard for determining market efficiency for bonds, Lead Plaintiffs also offered evidence on four additional factors to which the Fifth Circuit looks in this context; specifically, Lead Plaintiffs provided proof about NII's market capitalization; the bid-ask spread; the float, or issue amount outstanding excluding insider-owned securities; and the percentage of institutional ownership. In re HealthSouth Corp. Sec. Litig., 261 F.R.D. 616, 632 (N.D. Ala. 2009).

    The Basic presumption is rebuttable at both the certification and merits stages. In Halliburton II, the Supreme Court held that a defendant could rebut a showing of market efficiency at the class certification stage by putting forth "any showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price, will be sufficient to rebut the presumption of reliance. So for example, if a defendant could show that the alleged misrepresentation did not, for whatever reason, actually affect the market price, or that a plaintiff would have bought or sold the stock even had he been aware that the stock's price was tainted by fraud, then the presumption of reliance would not apply." Halliburton II, 134 S. Ct. at 2408 (internal citations and quotation marks omitted).

    Relying on a report by their expert, Chad Coffman, who is an economist and Chartered Financial Analyst, Pls. Mem., Ex. H at 5 (hereinafter "Coffman Report"), Lead Plaintiffs base their showing of market efficiency for both the stocks and bonds on the Cammer factors, along with three additional factors suggested in Krogman v. Sterritt, 202 F.R.D. 467 (N.D. Tex. 2001) (the

company's market capitalization; the bid-ask-spread; and the "float," or the percentage of securities not held by company insiders when engaging in a determination of market efficiency).

The first Cammer factor is average trading volume. Lead Plaintiffs point to NII common stock being listed and traded on NASDAQ throughout the class period, which weighs in favor of a finding of market efficiency. As Lead Plaintiffs argue, "most courts agree that [a] listing [on the NYSE or NASDAQ] is a good indicator of efficiency." Carpenters Pension, No. 2015 WL 5000849, at *7, *7 n.80 (collecting cases); Pls.' Mem. at 17. Defendants rightly point out that although this factor is probative of market efficiency, it is not dispositive. Defs.' Opp'n at 9 n.7 (collecting cases). Nevertheless, the volume of trading activity for both NII's stocks and bonds is a significant factor supporting a finding of an efficient market. During the class period, NII stocks averaged a daily trading volume of over 3.5 million shares, representing an average weekly turnover of 10.07%. Pls.' Mem. at 19. Similarly, the average weekly trading volume of NII bonds hovered around 2.94%. Id. These average weekly turnover percentages surpass the benchmark set down by Cammer of 2% for a "strong presumption" that the market was efficient. Cammer, 711 F. Supp. at 1286. Moreover, both types of securities were traded on a majority of possible trading days during the class period, which is probative of high trading frequency and investor interest. Pls.' Mem. at 19 (citing Coffman Report ¶ 105). Accordingly, although the showing on this factor alone does not carry the day, it is strongly suggestive that NII stocks and bonds traded in an efficient market.

The second Cammer factor is the number of securities analysts following the security because that fact "permits an inference that financial statements relating to a security are closely watched by investment professionals, who in turn inject their views on the company and the security into the market." In re Winstar Commc'ns Sec. Litig., 290 F.R.D. 437, 446 (S.D.N.Y.

2013). Lead Plaintiffs point to the existence of at least 528 reports about NII during the class period, which were published by 18 firms, including major banks like Credit Suisse, J.P. Morgan, and Morgan Stanley. Pls.' Mem. at 20. As Lead Plaintiffs correctly argue, this showing demonstrates that there was "an active market for information regarding the company and its securities, and that [such] information was widely distributed." Id. (citing Coffman Report ¶¶ 34-39, Ex. H). As such, this factor weighs in favor of a finding of market efficiency with regard to both NII common stock and bonds.

The third Cammer factor is the extent to which market makers and arbitrageurs trade in the stock. As the Southern District of New York explains, "market makers promote efficiency by reacting quickly to new information by buying or selling securities in order to drive their price to the market-clearing level." Winstar, 290 F.R.D. at 446. Under SEC regulations, a market maker is

> [A] dealer who, with respect to a particular security, (i) regularly publishes bona fide, competitive bid and offer quotations in a recognized interdealer quotation system; or (ii) furnishes bona fide competitive bid and offer quotations on request; and, (iii) is ready, willing and able to effect transactions in reasonable quantities at his quoted prices with other brokers or dealers.

17 C.F.R. § 240.15c3-1(c)(8). Essentially, the existence of market makers indicates that a security is liquid and that relevant information is disseminated and appropriately assimilated into the price, particularly when analyzing securities traded in over-the-counter markets. See Cammer, 711 F. Supp. at 1283. Given that NII common stocks were traded on NASDAQ, a market with continuous public price and volume reporting, Pls.' Mem. at 20-21, and NII's listing of those stocks remained in good standing throughout the class period with regard to reporting requirements, this factor further supports a showing of market efficiency for NII common stock because the NII's stock were continuously listed on NASDAQ throughout the class period. This listing alleviates any concern that market makers might otherwise remediate for securities listed on over-the-counter markets with regard to their liquidity and information dissemination. In terms of the NII bonds,

Lead Plaintiffs have demonstrated market efficiency by pointing to over 100 separately identifiable market participants who traded in NII bonds during the class period. Id. at 21 (citing Coffman Report ¶ 111). Accordingly, this factor contributes to a finding of market efficiency for NII common stock as well as for NII bonds.

The fourth Cammer factor requires a relatively straight-forward determination—whether the company was eligible to file an SEC Form S–3 registration statement. As the First Circuit summarized, "[c]ompanies permitted by the SEC to file an S–3 Registration Statement, an abbreviated prospectus requiring fewer disclosures than Forms S–1 or S–2, are those which meet the $75 million market capitalization requirement and have filed reports with the SEC for twelve consecutive months." In re Xcelera.com Sec. Litig., 430 F.3d 503, 517 n.9 (1st Cir. 2005) (summarizing the core requirements set down in 17 C.F.R. § 239.13 (2003)). This status is relevant to the inquiry because "Form S–3 is reserved for companies whose stock is actively traded and widely followed." Unger v. Amedisys Inc., 401 F.3d 316, 326 n.5 (5th Cir. 2005). In other words, when an issuer of securities meets Form S–3's requirements, the market for its securities is likely one that quickly assimilates material public information into the price because the market is well developed and trading is robust. There is no dispute that NII was S–3 eligible and filed Forms S–3 during and surrounding the class period. Pls.' Mem. at 22 (citing Compl. ¶ 353; Answer ¶ 353). This Cammer factor accordingly weighs in favor of a finding that the market for NII common stock was efficient.

The fifth and final Cammer factor focuses on empirical evidence that demonstrates "a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price." Cammer, 711 F. Supp. at 1286-87. This is the Cammer factor that defendants vigorously dispute. Lead Plaintiffs attempt to satisfy this factor with an

event study conducted by their expert, Coffman, in which he applied regression analyses to determine the relationship between the price of the relevant security and broader market factors. Specifically, he compared the price fluctuation of NII common stock and bonds on days with earnings announcements with their price movement on days with minimal or no news related to NII. Pls.' Mem. at 22. The analyses, which Coffman ran for each event day, controlled for several variables such as the S&P 500 Total Return Index, the BNY Mellon Latin America ADR Index, and a weighted index of peer firms that could otherwise explain price fluctuations. Coffman Report ¶ 51. These analyses indicated a positive correlation between changes in NII stock prices and control variables. Id. ¶ 58.

After adjusting for the price impact borne out by the regression, Coffman found that quarterly earnings announcements resulted in statistically significant price movements at the 95% confidence level for 12 of the 18 event days he analyzed. Id. ¶ 62. In contrast, for 162 days with no earnings announcements, Coffman found 14 statistically significant price movements. Id. A finding supporting a price reaction on 66.7% of earnings announcement days is greater than several findings deemed sufficient by other district courts. See Petrie v. Elec. Game Card, Inc., 308 F.R.D. 336, 354 (C.D. Cal. 2015) (certifying class because of strong showing on other Cammer factors, even though expert only found statistically significant price movement on 8 of 50 days); Carpenters Pension, 2015 WL 5000849, at *17 (finding market efficiency based on an event study demonstrating price reaction on 5 out of 15 event days, but noting that the court would have found efficiency regardless of the fifth Cammer factor showing).

For NII bonds, Coffman found that bonds reacted to bond-value-relevant news. Pls.' Mem. at 24 (citing Coffman Report ¶ 122). Specifically, the 10% Notes displayed a statistically significant reaction for 7 of 16 earning announcement days (43.75%), whereas there was

statistically significant movement on 8.97% of non-news days. Id. (citing Coffman Report ¶ 118).

The 8.875% Note and the 7.625% Note displayed similar reactions. Id. Moreover, Coffman's

report demonstrated that trading volume of all three types of bonds responded in a statistically

significant manner to earnings announcements and other NII news. Id.

      Defendants attempt to defeat Lead Plaintiffs' claim that the market was efficient by

attacking Coffman's methodology and conclusions. To do this, they rely on a report produced by

their expert, Paul A. Gompers, a Professor of Business Administration at Harvard, Defs.' Opp'n,

Ex. A (hereinafter "Gompers Report"). First, defendants argue that Coffman's conclusions are

unfounded because he failed to analyze whether the news released on the 18 event days was new or

unexpected. Defs.' Opp'n at 13. Lead Plaintiffs persuasively rebut this attack, arguing that

Coffman's study avoids bias by using objective measures of event days, namely those days on

which NII earnings announcements were made. Pls.' Reply Mem. in Supp. at 11 [Dkt. No. 220],

Oct. 28, 2015 ("Pls.' Reply"). Indeed, an expert report relying on a study containing cherry-picked

event dates is far less persuasive than one in which objective criteria were used. See, e.g., In re

PolyMedica Corp. Sec. Litig., 453 F. Supp. 2d 260, 270 (D. Mass. 2006) (finding an expert's

"mere listing of five days on which news was released and which exhibited large price fluctuations

proves nothing").

      Defendants next contend that Coffman's analysis is flawed because he failed to analyze

whether price reactions were consistent with the nature of the news released in the earnings

reports. Defs.' Opp'n at 14. The record shows that one of the event days on which Coffman found

statistically significant price movement should be discounted because the movement was

inconsistent with the nature of the news released. Id. Specifically, the NII earnings announcement

on April 26, 2012 exceeded consensus expectations, yet the stock price exhibited a statistically

significant decrease of 23.58%. Gompers Report ¶ 37. This correction reduces the statistically significant price impact to 61.1% of the time rather than 67.7% of the time, a negligible reduction and hardly determinative of the outcome of this inquiry. In addition, defendants' contention that Coffman's study is flawed because he failed to adjust his results for the Holm-Bonferroni[1] correction is misplaced because of the relatively small sample size here. Id. at 15; Pls.' Reply at 13. Moreover, study results with a confidence interval of 99% are not required to show price impact in this context. Pls.' Reply at 13 (citing Coffman Rebuttal ¶¶ 46-52). Even if Lead Plaintiffs' event study were considered less than robust, defendants' critiques do not successfully rebut Lead Plaintiffs' showing on the fifth Cammer factor, nor are they dispositive of the market efficiency inquiry.

In addition to the Cammer factors, Lead Plaintiffs put forth evidence of three additional factors that support a finding of market efficiency suggested by Krogman v. Sterritt, 202 F.R.D. 467 (N.D. Tex. 2001). First, Lead Plaintiffs point to NII's market capitalization, which was higher than the majority of firms offering NASDAQ-traded stocks during the class period. Pls.' Mem. at 25. Specifically, between 166 million and 173 million shares of NII stock were outstanding during the class period, the market price of which denotes an average market capitalization of $3.73 billion. Id. Likewise, as of December 5, 2011, more than $1.45 billion in NII bonds were outstanding, which also supports the conclusion that their market was efficient. Id. at 25-26.

Similarly, the monthly bid-ask spread for NII stocks during the class period ranged from 0.5 cents to 2 cents, meaning the weighted average spread was only 0.106%. Id. "The bid-ask spread is the difference between the price at which investors are willing to buy the stock and the

---

[1] This is a statistical method for correcting the error rates involved in multiple comparisons and to counteract the problem of false positives. Sture Holm, A Simple Sequentially Rejective Multiple Test Procedure, 6 Scand. J. Statist. 65 (1978), available at http://www.jstor.org/stable/4615733.

price at which current stockholders are willing to sell their shares." <u>Krogman</u>, 202 F.R.D. at 478. A

narrow bid-ask spread indicates the presence of an efficient market because it suggests that the

stock is liquid and more likely to be traded. <u>Id.</u> According to Coffman, NII's weighted average

placed NII stocks within the 42nd percentile of 100 other randomly sampled securities traded on

the NYSE and NASDAQ. <u>Id.</u> (citing Coffman Report ¶ 72). This spread is narrower than those that

other courts have found to weigh in favor of finding market efficiency. <u>See, e.g.</u>, <u>Cheney v.</u>

<u>Cyberguard Corp.</u>, 213 F.R.D. 484, 501 (S.D. Fla. 2003) (finding that 2.44% average daily relative

bid-ask spread was suggestive of market efficiency). Accordingly, this Court finds this factor

weighs in support of a finding of market efficiency.

Lead Plaintiffs next raise the factor of the percentage of securities owned by outsiders,

including institutions. "This percentage, known as the 'float,' is helpful regarding market

efficiency as insiders may have information that is not yet reflected in stock prices, the prices of

stocks that have greater holdings by insiders are less likely to accurately reflect all available

information. Accordingly, a high percentage of insiders holding stock and a relatively low float

weigh against a finding of market efficiency." <u>Cheney</u>, 213 F.R.D. at 502 (internal quotation

marks and citations omitted). Lead Plaintiffs highlight NII's strong public float of 98.9%, which

means that insiders held only 1.1% of outstanding shares. Pls.' Mem. at 27. Institutional ownership

of NII stock was also robust; institutions held an average of 95.03% of the public float at the end of

each quarter during the class period. <u>Id.</u> NII bonds also displayed a public float suggestive of

market efficiency. An average of approximately 50% of NII bonds were held by institutions during

the class period. Accordingly, the public floats of both NII stocks and bonds support a finding of

market efficiency.

Despite defendants' vigorous attacks on Coffman's findings and on Lead Plaintiffs'

arguments as to market efficiency, they neither rebut Coffman's findings nor offer any evidence to demonstrate that the market was not efficient. Accordingly, even if the fifth <u>Cammer</u> factor were considered weak, the evidence offered in support of the other <u>Cammer</u> factors as well as the non-<u>Cammer</u> factors is more than sufficient to demonstrate by a preponderance of the evidence that the stocks and bonds at issue traded in an efficient market. As such, Lead Plaintiffs are entitled to the <u>Basic</u> presumption and, at this stage, need not make individualized showings of reliance. Furthermore, as a result, the element of reliance poses no obstacle to the finding of predominance required for class certification.

The final issue within the predominance inquiry is the damages element. Lead Plaintiffs argue that classwide damages are subject to a common methodology that does not scuttle predominance. Pls.' Mem. at 29. Specifically, they point to the standard formula for assessing damages under Rule 10b-5, which is the artificial inflation at the time of purchase reduced by the artificial inflation at the time of sale if the security was sold before the fraud was revealed, or otherwise merely the artificial inflation at the time of purchase. Coffman Report ¶¶ 138-39. Despite the defendants' arguments to the contrary, <u>Comcast</u> merely held that "a model purporting to serve as evidence of damages in [a] class action must measure only those damages attributable to that theory. If the model does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)." <u>Comcast Corp. v. Behrend</u>, 133 S. Ct. 1426, 1433 (2013). Moreover, the Fourth Circuit has not articulated any requirement of a fulsome classwide damages model at the certification stage.

Lead Plaintiffs provide adequate detail regarding a method for calculating classwide damages and measuring the artificial inflation of each share on a given day. Coffman Report ¶¶ 138, 139. The method offered by Lead Plaintiffs is widely accepted as the traditional measure of

damages for Rule 10b-5 actions. See, e.g., Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128, 155 (1972) ("In our view, the correct measure of damages . . . is the difference between the fair value of all that the mixed-blood seller received and the fair value of what he would have received had there been no fraudulent conduct."). There is no convincing demonstration by the defendants that this damages theory does not closely hew to Lead Plaintiffs' theory of liability or that such a theory could not be applied class-wide. Accordingly, Lead Plaintiffs' damages model supports a finding of predominance.

    2.  Superiority

Finally, the Court finds that litigation through "class action is superior to other available methods for fairly and efficiently adjudicating the controversy," Fed. R. Civ. P. 23(b)(3), with reference to:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
> (D) the likely difficulties in managing a class action

Id.

Lead Plaintiffs correctly argue that class members have a limited interest in asserting individual claims because they are geographically dispersed and their damages claims have a negative value insofar as they would be uneconomical to assert individually. Pls.' Mem. at 29. Class treatment is the superior method for resolving this action because it would alleviate those problems, allowing the pooling of damages claims so as to make prosecution of the action economically rational. Id. at 30. Further, Lead Plaintiffs submit that they are unaware of any pending litigation in the United States putting forth similar allegations aside from those already consolidated within the pending action. Id. Relatedly, Lead Plaintiffs contend that class treatment

would eliminate the risk of inconsistent adjudication and promote the fair and efficient use of the judicial system. Id. Finally, Lead Plaintiffs highlight that federal securities fraud cases are routinely certified and present no unusual issues of manageability. Id. (citing In re BearingPoint, Inc. Sec. Litig., 232 F.R.D. 534, 544 (E.D. Va. 2006)).

III. Conclusion

For all of the above-stated reasons, Lead Plaintiffs have demonstrated that they satisfy the requirements of Fed. R. Civ. P. 23(a) and (b) by a preponderance of the evidence and their Motion for Class Certification and Appointment of Class Representatives and Class Counsel [Dkt. No. 199] will be granted in an appropriate Order to be issued with this Memorandum Opinion.

Entered this _17_ day of November, 2015.

Alexandria, Virginia

/s/

Leonie M. Brinkema
United States District Judge

# EXHIBIT 2

(*Class Certification Order* – ECF No. 228)

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

IN RE NII HOLDINGS, INC. SECURITIES )  1:14cv227 (LMB/JFA)
LITIGATION )
)
)

## ORDER

For the reasons stated in the accompanying Memorandum Opinion, the Lead Plaintiffs'

Motion for Class Certification and Appointment of Class Representatives and Class

Counsel [Dkt. No. 199] is GRANTED, and it is hereby

ORDERED that pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3), the following class is

certified:

> All persons and entities that, during the period from February 25, 2010 through February
> 27, 2014, inclusive, purchased or otherwise acquired the publicly traded securities of NII
> Holdings, Inc. ("NII Holdings") and/or NII Capital Corp. ("NII Capital", together with
> NII Holdings, "NII" or the "Company") and who were damaged thereby. The eligible
> securities are NII Holdings common stock ("NII Stock"), as well as the following debt
> securities ("NII Bonds"): (i) 7.625% NII Bonds, due April 1, 2021 (ISIN:
> US67021BAE92); (ii) 8.875% NII Bonds, due December 15, 2019 (ISIN:
> US67021BAC37); and (iii) 10% NII Bonds, due August 15, 2016 (ISIN:
> US67021BAD10);[1]

and it is further

ORDERED that Lead Plaintiffs Danica, Industriens, Operating Engineers Pension

Trust Fund, IBEW Local No. 58/SMC NECA Funds, and Jacksonville P&F be and are

---

[1] Excluded from the Class are: Defendants Steven P. Dussek, Steven M. Shindler, and Gokul
Hemmady; members of the immediate family of any Defendant who is an individual; any
person who was an officer or director of NII during the Class Period; any firm, trust,
corporation, or other entity in which any Defendant has or had a controlling interest; NII's
employee retirement and benefit plan(s); Defendants' directors' and officers' liability
insurance carriers, and any affiliates or subsidiaries thereof; and the legal representatives,
agents, affiliates, heirs, successors-in-interest, or assigns of any such excluded party.

appointed Class Representatives of the Class pursuant to Fed. R. Civ. P. 23(a); Co-Lead

Counsel, Labaton Sucharow LLP and Kessler Topaz Meltzer & Check, LLP be and are

appointed Co-Counsel for the Class pursuant to Fed. R. Civ. P. 23(g); and Susan R. Podolsky

be and is appointed as Liaison Counsel for the Class.

The Clerk is directed to forward copies of this Order to counsel of record.

Entered this 17th day of November, 2015.

/s/

Leonie M. Brinkema
United States District Judge

Alexandria, Virginia

# EXHIBIT 3

(*Class Certification Hearing Transcript* – ECF No. 226)

1

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

IN RE NII HOLDINGS, INC.          .     Civil Action No. 1:14cv227
SECURITIES LITIGATION,            .
                                  .     Alexandria, Virginia
                                  .     November 6, 2015
. . . . . . . . . . . . . . . X          10:00 a.m.

TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE LEONIE M. BRINKEMA
UNITED STATES DISTRICT JUDGE

<u>APPEARANCES</u>:

FOR THE PROPOSED CLASS:           SUSAN R. PODOLSKY, ESQ.
                                  Law Offices of Susan R. Podolsky
                                  1800 Diagonal Road, Suite 600
                                  Alexandria, VA 22314
                                    and
                                  JENNIFER L. JOOST, ESQ.
                                  Kessler Topaz Meltzer &
                                  Check, LLP
                                  One Sansome Street, Suite 1850
                                  San Francisco, CA 94104
                                    and
                                  SERENA P. HALLOWELL, ESQ.
                                  MATTHEW J. HRUTKAY, ESQ.
                                  Labaton Sucharow LLP
                                  140 Broadway
                                  New York, NY 10005

FOR DEFENDANTS STEVEN P.          MICHAEL D. WARDEN, ESQ.
    DUSSEK, STEVEN M.             Sidley Austin LLP
    SHINDLER, AND GOKUL V.        1501 K Street, N.W.
    HEMMADY:                      Washington, D.C. 20005
                                    and
                                  DOROTHY J. SPENNER, ESQ.
                                  Sidley Austin LLP
                                  787 Seventh Avenue
                                  New York, NY 10019

OFFICIAL COURT REPORTER:          ANNELIESE J. THOMSON, RDR, CRR
                                  U.S. District Court, Fifth Floor
                                  401 Courthouse Square
                                  Alexandria, VA 22314
                                  (703)299-8595

COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

P R O C E E D I N G S

1

2      THE CLERK:  Civil Action 14-227, Iron Workers

3 District Council of New England Pension Fund, et al. v. NII

4 Holdings, Inc., et al.  Will counsel please note your

5 appearances for the record.

6      MS. PODOLSKY:  Good morning, Your Honor.  Susan

7 Podolsky for the class, and with me this morning are Serena

8 Hallowell and Matthew Hrutkay from the Labaton Sucharow firm

9 and Jennifer Joost from the Kessler Topaz firm.  Ms. Hallowell

10 will present argument on the class certification motion.

11      THE COURT:  All right.

12      MS. PODOLSKY:  Thank you very much.

13      MR. WARDEN:  Good morning, Your Honor.  Michael

14 Warden from Sidley Austin on behalf of the defendants, and I'd

15 like to introduce Dorothy Spenner, who will be presenting

16 argument on behalf of the defendants today.

17      THE COURT:  I have to -- I can't miss making the

18 comment, look at the number of female attorneys this morning.

19 This is wonderful.  I'm very pleased to see that this, this

20 case will be well-lawyered.  All right.

21      And again, speaking of well-lawyered, I thought the

22 briefs on both sides were quite thorough and quite clear, so

23 I've read them, and I don't need to hear a lot of repetition.

24 And actually, I would like to hear from the defendant.

25      Is there anything in Mr. Gompers' report that you can

1  point to where he has presented any evidence that the markets

2  at issue in this case were not efficient during the time of the

3  class period?  Because as you know, under *Halliburton*, that is

4  certainly a factor the Court can consider, and the plaintiffs

5  particularly in their reply brief have focused on the fact that

6  although Mr. Gompers has taken issue with various aspects of

7  their expert's report, trying to undercut the adequacy of that

8  report to support a finding of an efficient market, he has not

9  offered any actual evidence that one could look at to support

10  the proposition that the market is actually not efficient.

11        MS. SPENNER:  Well, Your Honor, he hasn't done, and

12  he testified as much, that he hasn't done his own study of

13  inefficiency, but the burden is not on defendants to do that,

14  and courts have addressed this particular issue.  We're not in

15  a situation where plaintiffs have come forth with sufficient

16  evidence of efficiency and it is upon defendants to rebut that.

17  We're not in a price impact situation.

18        THE COURT:  But the burden on the plaintiff is only

19  preponderance of the evidence.  This is not, you know, clear

20  and convincing.  It's not proof beyond a reasonable doubt.  And

21  again, we're still at the early stages to some degree of this

22  litigation.

23        And I must say, I thought that most of what

24  Mr. Coffman said is actually not even contested by you-all,

25  which is good, you're not wasting our time on non-, you know,

4

1    really on issues that just don't need to be addressed.  I mean,

2    the real focus here, unless I've misread your papers, is on

3    whether there's adequate evidence of an efficient market.

4              MS. SPENNER:  Correct, Your Honor.

5              THE COURT:  All right.

6              MS. SPENNER:  And there isn't in this case for a

7    number of reasons.

8              THE COURT:  All right.

9              MS. SPENNER:  As the experts agree, the hallmark of

10   market efficiency is really the cause-and-effect test, the

11   fifth *Cammer* factor, and if you look at Mr. Coffman's analysis

12   of the fifth *Cammer* factor, there's two major problems with it.

13             In the first instance, his test is just not set up in

14   the way that a financial economist would set up the test.  He

15   is not testing market efficiency, which is whether the price

16   responds to relevant events, and his whole test is not set up

17   in a way where it looks at potential events and first tests

18   without any bias for looking backwards whether the events

19   actually are value relevant and news events and makes certain

20   assumptions and looks at analysts' predictions.

21             THE COURT:  Well, the events he's looking at are the

22   financial statements, isn't he, the 18 events that he took?

23             MS. SPENNER:  Well, he's looking at earnings

24   announcements, but it's interesting, in his rebuttal report,

25   Mr. Coffman says, "I look at earnings announcements because

5

1  they're objective and without expectation that they will

2  actually move the price."

3          And I think, Your Honor, that reveals that he's kind

4  of starting backwards and putting the cart before the horse,

5  right?  He's not even analyzing whether they are the types of

6  events that would have a price movement or giving any weight to

7  what direction the price should move in from the get-go.

8          THE COURT:  But what, what evidence do you have that

9  an earnings statement would be an inappropriate way of testing,

10  an inappropriate choice?

11         MS. SPENNER:  Well, I don't think that's what

12  Professor Gompers is saying, Your Honor.

13         THE COURT:  That's right.

14         MS. SPENNER:  I don't think Professor Gompers is

15  saying that earnings announcements per se are an inappropriate

16  thing to look at.  I think what he's saying is the way the test

17  events study, plaintiff's events study was set up is just

18  flawed from the get-go, because you're not testing whether

19  prices really respond to new and value-relevant information

20  because you're not assessing whether the information is value

21  relevant, and you're not assessing what direction the price is

22  even moving in.

23         The mere fact that when Professor Gompers looked at

24  it, there's a price -- there's a date on which the price is

25  moving in the opposite direction in which it should based on

6

1    the news, kind of shows that it's not really a test of market

2    efficiency at all.

3           And then even when you look at Mr. Coffman's results,

4    it's pretty staggering how, how rarely the price actually

5    reacts to the events that he chose and that he looked at.  I

6    mean, on the bonds in particular, you have even without any of

7    the adjustments that Professor Gompers makes, you have over 60

8    percent of the time and with adjustments over 75 percent of the

9    time the price is not reacting.

10           That's not -- that doesn't come close --

11           THE COURT:  But that also means 35 percent of the

12    time, there is a reaction.

13           MS. SPENNER:  But the case law, Your Honor, is clear

14    that that's just not enough, even from, from a case

15    perspective, case law perspective or from a financial economics

16    perspective.

17           THE COURT:  Well, you know, that's interesting

18    because the other thing that bothered me as I was looking at

19    the pleadings and looking at the case, the cases that I was

20    reading, there does not appear to be a gold standard.  I don't

21    see any court that has said, you know, X percent is the bright

22    line.  It has to be at that point to make it an efficient

23    market, or if it's below a certain point, it's an inefficient

24    market.  In other words, it's all over the waterfront.

25           I think it does depend to some degree on an

7

1    individual analysis of each case and all of its factors, but, I

2    mean, you know, here, for example, you know, one of the factors

3    about whether this is an efficient market or not, it's

4    uncontested that the -- that stocks are traded on the NASDAQ,

5    which is, you know, one of the major markets we have, and

6    courts have looked at that as a strong indicator, not

7    dispositive but a strong indicator that the market in which

8    those securities are being traded is efficient.

9             MS. SPENNER:  Well, I think there's two key points

10   there.  First is the two experts in this case agree that *Cammer*

11   factor 5 is in a sense the most direct test, the essence of

12   market efficiency, and courts have repeatedly found that as

13   well.

14            THE COURT:  And, of course, now you are also in the

15   Fourth Circuit, and the Fourth Circuit is perhaps not as wedded

16   to the *Cammer* factors as some other districts might be.  I

17   mean, it certainly says it's appropriate to look at them and

18   they are helpful in making the analysis, but they're not the

19   be-all and end-all of the analysis, and in the Fourth Circuit,

20   I mean, if there are other major factors that push in favor of

21   efficiency even if all the *Cammer* factors were not satisfied, I

22   don't think that would necessarily defeat certification.

23            MS. SPENNER:  Well, Your Honor, if you look at the

24   Fourth Circuit law, the *Gariety* case in particular, it does

25   cite all of the *Cammer* factors with a parenthetical and goes

8

1   through them, and certainly from the financial economics

2   perspective, there really is no question again the experts

3   agree that the fifth factor is kind of the most direct test of

4   efficiency.

5           But also, if you look at the jurisdiction across the

6   nation in analyzing cases unlike the cases that plaintiffs are

7   citing in the Eastern District of Virginia, cases that really

8   turn on and analyze and apply a regression analysis to the

9   fifth factor in particular, they don't find that class

10  certification efficient market test is met under circumstances

11  similar to that here.

12          So if you look in particular at the *China Automotive*

13  case, it's particularly instructive, and there Judge Katherine

14  Forrest in the Southern District of New York, she found a

15  number of things.  First, she made very, very clear that it is

16  not incumbent on defendants to prove inefficiency.  The burden

17  is directly on plaintiffs to prove efficiency.

18          Second, she analyzed a number of cause-and-effect

19  tests that the plaintiff's expert in that case went through.

20  One of them was actually the exact test that Mr. Coffman put

21  forth, and interestingly, in that case, both the Court found

22  and the plaintiffs conceded in that case that comparing news

23  days, movement on news days to movement on no news days alone

24  in and of itself is simply not a test of market efficiency and

25  could not stand alone to prove market efficiency, and that's

9

1   the one and only test before this Court as of now.

2          She also held that when you look at the fourth test,

3   it was called the fourth test in that case, which measured the

4   quantity of time that the price moved in relation to earnings

5   releases, there she found 50 percent of the time isn't even

6   enough, and that kind of goes to Professor Gompers' testimony

7   and Professor Gompers' point, that from, you know, the Father

8   of Market Efficiency, Eugene Fama, on down, the standard is not

9   that the price should respond sometimes or some of the time.

10  The standard is that particularly if the test is set up right,

11  the price should respond all or nearly all of the time.

12          So situations like this, where it's not responding a

13  third of the time on the stock or not responding over 60

14  percent of the time on the bonds, just don't even really come

15  close from a financial economics perspective or a legal

16  perspective to what courts and economists require for market

17  efficiency.

18          THE COURT:  All right, let me hear from the plaintiff

19  on that.  Do you want to start by addressing *China Automotive*?

20          MS. HALLOWELL:  Excuse me, Your Honor, I didn't hear.

21          THE COURT:  Yes.  Do you want to start by addressing

22  the argument that was just made about the *China Automotive* case

23  from the Eastern District -- Southern or Eastern District of

24  New York?

25          MS. SPENNER:  Southern District of New York.

10

1            THE COURT:  Southern.

2            MS. HALLOWELL:  Serena Hallowell, Your Honor --

3            THE COURT:  Yes, ma'am.

4            MS. HALLOWELL:  -- from Labaton on behalf of the

5    plaintiffs.  Thank you.

6            Yes, Your Honor.  Actually, if I may, I wanted to

7    take it back to your point that in the Fourth Circuit, the

8    *Cammer* factors are not required to be --

9            THE COURT:  You're looking at *Carpenters Pension*

10   *Fund*?

11           MS. HALLOWELL:  Excuse me?

12           THE COURT:  *Carpenters Pension Fund*?  Is that the

13   case you're relying on for that proposition?

14           MS. HALLOWELL:  *Gariety*, *CSC*, *BearingPoint*.  The

15   cases that have been decided in the Fourth Circuit, none of

16   them have mandated that all of the *Cammer* factors be evaluated,

17   and instead, they have focused on certain factors that bear on

18   whether securities are actively traded, whether there is a

19   sufficiently high volume of, of trading, and whether market

20   professionals follow the securities.

21           There's no requirement that an expert report be

22   submitted, no requirement that an event study be submitted.

23   The precedent in this circuit, you know, is clear on that.

24   We've satisfied that precedent.  We've provided evidence that

25   these securities have been actively traded, that they are

1  followed by market professionals, and that their volume exceeds

2  the thresholds commonly found for efficiency.

3        In addition to that, plaintiffs have gone beyond that

4  in order to provide the Court with as much evidence as we can

5  to, to make clear that this is a case where the securities of

6  NII traded in an efficient market.

7        And I'd just like to pause and say, you know, as this

8  Court rightly recognized or, you know, appropriately

9  recognized, I think, defendants don't offer any affirmative

10  evidence here.  They instead just target Mr. Coffman's

11  objective and well-reasoned events study, which focuses on

12  *Cammer* factor No. 5.

13        *Cammer* factor No. 5, the two experts do not agree

14  that that's the most important factor to evaluate in terms of

15  efficiency.  Our expert and, I think, our papers confirm that

16  you should do a holistic analysis of all of the efficiency

17  factors.  Here we supplied ten efficiency factors in support of

18  the efficiency of the common stock.  Only one of them has been

19  addressed by the defendants.  There is -- they've ignored the

20  other nine factors on the common stock.

21        And similarly, we've provided evidence of nine

22  efficiency factors in support of our bonds trading in an

23  efficient market, and again, defendants and their expert ignore

24  eight of those nine efficiency factors.

25        In the context of whether plaintiffs have met their

1    burden, I believe that the evidence that we've provided is more

2    than adequate, and defendants have not even sought to rebut it.

3            THE COURT:  All right.  Well, I'm going to -- I'll

4    rule in the near future on this issue.  I'm most likely going

5    to grant the motion to certify, all right?  I will take one

6    more look at the law.

7            Again, I recognize that the Fourth Circuit is

8    certainly not, you know, a court -- a circuit in which there's

9    a ton of securities litigation.  I mean, frankly, the Second

10   Circuit, I would suspect, has the most of that type of

11   litigation, but there have been enough cases in this circuit,

12   and you are in the Fourth Circuit, and I'm bound to follow

13   Fourth Circuit law, not law from the Second Circuit or any

14   other circuit, and I do believe that the plaintiffs have

15   correctly described how the Fourth Circuit would be looking at

16   this case, and that is, it's a totality.  It's a full mix of

17   all of the factors.

18           The *Cammer* factors are not ignored.  We're not told

19   not to look at them, but they're clearly not dispositive, and

20   it is correct on that record, I think the only *Cammer* factor

21   that's really been hotly contested has been this one about the

22   efficiency of the market, and frankly, the real issue has been

23   the adequacy of the, of the Coffman report.

24           And I again, one of the things that troubled me as I

25   read Mr. Gompers' position was he kept talking about, you know,

1  certain percentages, and I couldn't see anywhere where there

2  was this sort of bright line that, you know, that if the study

3  doesn't reach a certain percentage, it's automatically

4  inadequate.  And so I'll take one more look at it, but I'm

5  letting you know right now where I most likely think it's going

6  to -- the decision is going to be.

7          Now, having said that, I know this case has been on

8  the docket for a while, and I know that Judge Anderson issued a

9  revised discovery and scheduling order.  I know that the

10  corporate defendant went into bankruptcy and is out of this

11  case, but since you're with me and you heard my little spiel

12  earlier about proportionality and the new approach that we're

13  going to take, I think especially this Court, as a very active

14  approach to help counsel, frankly, and to help their clients in

15  trying to avoid, you know, unnecessary costs, litigation costs,

16  did the plaintiffs receive anything from the bankruptcy?

17          MS. PODOLSKY:  In terms of the document production?

18          THE COURT:  No, no, in terms of any money.

19          MS. PODOLSKY:  No.

20          THE COURT:  No.  So it wound up being -- is that not

21  correct?

22          MR. WARDEN:  If I could just clarify?

23          THE COURT:  Go ahead, yeah, yeah.

24          MR. WARDEN:  If there are bondholders who were

25  holding until the end of the bankruptcy, they received a

14

1   distribution.  Now, the fact of the matter is probably most

2   investors --

3              THE COURT:  Got out before?

4              MR. WARDEN:  -- got out before, because you have

5   various hedge funds and others who try to buy these distressed

6   bonds in bankruptcy and get a recovery on them.

7              So there's some possibility that some bondholders

8   received a distribution in the bankruptcy.

9              THE COURT:  Interesting, all right.  But other than

10  that, to speak crassly, but let's, you know, we're talking

11  money in this case, the pocket which the plaintiff -- from

12  which the plaintiff could recover if the plaintiffs were to win

13  is these three individual executives and, I assume, the

14  insurance policies that cover them.

15             MS. PODOLSKY:  Right.

16             THE COURT:  All right.

17             MS. PODOLSKY:  That's correct.

18             THE COURT:  And you-all know what that is.  I don't

19  need the numbers, but, I mean, that's been disclosed.

20             MS. PODOLSKY:  Yes, we do.  Yes, we do.

21             THE COURT:  Okay.  In terms of each side's estimation

22  of the litigation costs, I'm assuming that each side has given

23  their respective clients a proposed budget as to what the case

24  will cost if it goes forward?

25             MS. PODOLSKY:  We have.

15

```
 1              THE COURT:  Sure.  And I'm sure the defense has done
 2    the same thing.
 3              MR. WARDEN:  We have, Your Honor.
 4              THE COURT:  All right.  Does that leave much?
 5              MS. PODOLSKY:  Yes.
 6              THE COURT:  There is still something there?
 7              MS. PODOLSKY:  Yes.
 8              THE COURT:  All right.  And it's fairly significant,
 9    what would be left?
10              MS. PODOLSKY:  Your Honor, could we approach and have
11    a conversation that's not on the record with you about this?
12              THE COURT:  Well, I won't do that to you.
13              MS. PODOLSKY:  Okay.
14              THE COURT:  But I'm just saying -- all right.  I'm
15    just saying, obviously -- and I know both of you have been in
16    this court before, and you know how we operate here -- I don't
17    know whether you've been talking with Judge Anderson about, or
18    a private mediator about trying to resolve this case.  Maybe
19    you were waiting for this decision, and I don't want to hold
20    you up in that respect, so we're going to get you an answer
21    very quickly, but has there been any effort made to resolve
22    this case yet?
23              MS. PODOLSKY:  There has.
24              THE COURT:  Okay.
25              MS. PODOLSKY:  And again, we'd be happy to come up
```

1  and talk to you about it.  I just would rather not do it in

2  open court and on the record, but we're happy to come talk to

3  you.

4          THE COURT:  I won't force you to put it on the

5  record, but I'm just saying -- good.  I mean, that's a good

6  thing that you've been thinking about it.  And again, as I

7  said, if Judge Anderson has worked with you, I mean, he's very

8  effective in settling cases.  There are all kinds of very good

9  private mediators.  A lot of them are former judges.  Judge

10 Poretz, one of our former magistrate judges, is in the private

11 sector, who also does this.

12         But I'm glad to hear that perhaps you're thinking

13 about that.

14         MR. WARDEN:  May I consult with counsel for one

15 moment?

16         THE COURT:  Sure.

17         MS. PODOLSKY:  Your Honor, so we have been engaged in

18 private mediation.  We had a meeting last Tuesday before former

19 Judge Pisano in Newark, New Jersey, so we are negotiating.

20         THE COURT:  Okay.  That's good.

21         MS. PODOLSKY:  And we'll, we'll give you a report at

22 the appropriate moment under the local rules, as we're required

23 to do.  We just -- we're a little bit careful about what we say

24 on the record.

25         THE COURT:  Obviously.  That's very sensitive, and I

17

1  don't want to tread on it, but I just want to let you know

2  that, I mean, I think these days more than in the past even,

3  this concept of proportionality needs to really start to be

4  thought through very carefully --

5          MS. PODOLSKY:  We understand.

6          THE COURT:  -- because litigation costs are just, you

7  know, so high.

8          Very good.  Well, I will get you an answer as quickly

9  as I can on this issue, and again, I want to commend counsel.

10  I thought the briefs were extremely well done, and it was a

11  good oral argument.  Thank you.

12          We'll recess court then for the day.

13          MR. WARDEN:  Thank you, Your Honor.

14          MS. PODOLSKY:  Thank you, Your Honor.

15                              (Which were all the proceedings

16                               had at this time.)

17

18              CERTIFICATE OF THE REPORTER

19      I certify that the foregoing is a correct transcript of

20  the record of proceedings in the above-entitled matter.

21

22

23      _____/s/_____

24                              Anneliese J. Thomson

25